UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10-CR-126 JD |
| | ) | |
| JEREMIE SHENEMAN (02) | ) | |

OPINION and ORDER

Pending before the Court is Defendant Jeremie Sheneman's Amended Motion for a New

Trial filed pursuant to Federal Rule of Criminal Procedure 33 [DE 138].

## I.  Procedural History

On October 13, 2010, an indictment was filed charging Defendants Michael Sheneman

and Jeremie Sheneman with four counts of wire fraud under 18 U.S.C. § 1343.  Specifically,

count 1 of the indictment alleged that on or about October 14, 2005, the Shenemans knowingly

caused a wire transfer to be transmitted in the amount of $52,265.80 from Netbank in Georgia to

Fifth Third Bank in Ohio, and the funds were the proceeds of a mortgage loan for the purchase of

505 North Walnut Street, South Bend, Indiana by Gladys Zoleko; count 2 of the indictment

alleged that on or about October 14, 2005, the Shenemans knowingly caused a wire transfer to be

transmitted in the amount of $54,954.82 from Netbank in Georgia to Fifth Third Bank in Ohio,

and the funds were the proceeds of a mortgage loan for the purchase of 1246 Diamond Avenue,

South Bend, Indiana by Gladys Zoleko; count 3 of the indictment alleged that on or about

October 17, 2005, the Shenemans knowingly caused a wire transfer to be transmitted in the

amount of $50,509.75 from Deutsche Bank Trust Company in New York to Fifth Third Bank in

Ohio, and the funds were the proceeds of a mortgage loan for the purchase of 726 South

Brookfield Street, South Bend, Indiana by Gladys Zoleko; and, count 4 of the indictment alleged

that on or about November 10, 2005, the Shenemans knowingly caused a wire transfer to be transmitted in the amount of $102,033.03 from JP Morgan Chase Bank in New York to Fifth Third Bank in Ohio, and the funds were the proceeds of a mortgage loan for the purchase of 1922 West 6th Street, Mishawaka, Indiana by Paul Davies.

To sustain the charges, the government had to prove that the Shenemans knowingly devised or participated in a scheme to defraud or to obtain money or property by means of false pretenses, representations or promises, as described in the count of the indictment; that they did so with the intent to defraud; that the false pretenses, representations or promises were material; and, that for the purpose of carrying out the scheme or attempting to do so, they caused interstate wire communications to take place in the manner charged in the particular count. *See United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); Pattern Criminal Federal Jury Instructions for the Seventh Circuit, p. 214.

After a four day trial, on May 5, 2011, the jury returned a verdict finding Michael and Jeremie Sheneman guilty on all four counts of wire fraud as charged in the indictment. After the jury was discharged, trial counsel for Jeremie Sheneman, Mr. Robert Truitt, filed a Rule 33 motion [DE 63, 64] claiming that a new trial was warranted because the evidence was insufficient to support the verdicts. Thereafter, Jeremie Sheneman filed a *pro se* letter with the Court claiming that his convictions were the result of his trial counsel's ineffectiveness, and requesting that the Court appoint him a new attorney to address Mr. Truitt's alleged ineffectiveness in an amended Rule 33 motion [DE 69]. Given that Jeremie Sheneman wanted his Rule 33 motion to allege the ineffectiveness of trial counsel, Mr. Robert Truitt, the Court appointed Jeremie Sheneman new counsel, Mr. Clark Holesinger [DE 88] and gave Mr.

2

Holesinger additional time to file an amended Rule 33 motion [DE 135].

Accordingly, Mr. Holesinger filed an Amended Motion for a New Trial [DE 138] on behalf of Jeremie Sheneman and claimed that Jeremie Sheneman's convictions were the result of Mr. Truitt's alleged ineffectiveness. Mr. Holesinger's Amended Motion for a New Trial also incorporates the original motion's argument that the evidence was insufficient to support the verdicts [DE 138 at 1]. The government filed its response [DE 66, 140] and requested that the Court enter an order waiving the attorney/client privilege between Jeremie Sheneman and Mr. Truitt so that the government may question Mr. Truitt about the specific allegations of ineffectiveness [DE 141]. However, the government sought such an order only if an evidentiary hearing was necessary in the case. *Id*. at 3, n. 2. After the Court ordered a response [DE 142], Mr. Holesinger confirmed that an evidentiary hearing was not needed because the defense would not be presenting any additional evidence, but would rely on the motions and trial evidence to support the Rule 33 motion [DE 143]. Thus, no evidentiary hearing was ordered on the motion[1] and the government's request to enter an order waiving the attorney/client privilege between Jeremie Sheneman and Mr. Truitt is DENIED [DE 141].

In the amended Rule 33 motion, Mr. Holesinger did not elaborate on the insufficiency of the evidence claim, but in support of Jeremie Sheneman's ineffective assistance claim, he provided a long list of items that Mr. Truitt purportedly failed to do, summarized as follows:

---

[1]The Court has determined that no evidentiary hearing is necessary because defense counsel has represented that no further evidence or argument would be presented to the Court and that Mr. Sheneman's claims rest on the evidence presented at trial and the parties' submissions [DE 143]. Upon review of the motions, files, and records of the case, the Court is convinced that Mr. Sheneman has failed to present facts necessary to substantiate his ineffective assistance claim or show that a hearing would provide any more information that could demonstrate that he is entitled to any relief. *See Yu Tian Li v. United States,* 648 F.3d 524, 532 (7th Cir. 2011) (same determination made in the context of a 28 U.S.C. § 2255 petition alleging ineffective assistance of counsel) (citing *Koons v. United States*, 639 F.3d 348, 354-55 (7th Cir. 2011)).

1. Defense counsel failed to clarify that per the purchase agreements, the seller pays the closing cost, the buyer accepts the property "as is," and the buyer inspected the property prior to signing;

2. Defense counsel failed to clarify that buyers signed the closing documents and verified the information continued therein and that the property was in good condition given that the property was insurable, appraisals detailed the properties condition, and review appraisals were conducted;

3. Defense counsel failed to present evidence that the applications were not prepared by Jeremie Sheneman, Jeremie received no commission check from Superior Mortgage, and Jeremie was not authorized to contact the lenders;

4. Defense counsel failed to show that at least four mortgage companies were involved, failed to substantiate ownership of those companies which was not the Shenemans, and failed to clarify that several sellers were involved;

5. Defense counsel failed to clarify that Jeremie Sheneman was not a mortgage broker, loan officer, or owner of a mortgage company, and he was not a buyer of these properties and he did not sign the loans;

6. Defense counsel failed to clarify that the buyers suffered no losses on the properties because "they put no down payment money in the transaction[s]," "the buyer[s] had no out of pocket expense[s]," the lenders took all of the properties back when properties were abandoned, and the buyers made money on the rents generated;

7. Defense counsel failed to present evidence that the lenders took the property back based on their own appraisals, charged an underwriter fee for their service, made money on all loans after accepting the value of the property as listed in the appraisals, knew these were 100% loans with no down payment placed in escrow, and knew that the seller was paying the closing costs per the purchase agreement signed by the buyer;

8. Defense counsel failed to clarify that other sellers were involved in the sales and these other sellers provided the properties that were not in good condition;

9. Defense counsel failed to present evidence showing that the Shenemans did not put money in any accounts;

10. Defense counsel failed to present evidence that these were subprime loans, non-sourced and non-seasoned funds could be used to pay the closing

costs, the loans were not asset driven loans, and the broker was aware of the internal guidelines which were complied with;[2]

11.    Defense counsel failed to clarify that the Shenemans were not in any position to determine whether the buyers would be successful as landlords and could not judge the buyers based on their "age, race, ethnic...";

12.    Defense counsel failed to object or file any pretrial motions limiting the misleading characterization of the buyers as the victims;

13.    Defense counsel failed to present evidence that no fraudulent paperwork was presented to prove the claims and that the "same paperwork that was used to interview the perspective buyer[s] was the same paperwork as the original at the closing for resigning";

14.    Defense counsel failed to present evidence showing that Jeremie Sheneman's handwriting was not involved in the relevant documents of the charged fraud;

15.    Defense counsel failed to clarify that using a power of attorney was not illegal or improper;

16.    Defense counsel failed to object to the government's incorrect characterization of the term "down payment" money instead of proper characterization as "closing cost" money, thus allowing the jury to be confused;

17.    Defense counsel failed to present evidence that the properties listed in counts 1-3 of the indictment were owned by Mike Lee and F&S Properties LLC;

18.    Defense counsel was not prepared to defend Jeremie Sheneman for "acts of other sellers" because Jeremie Sheneman did not have information "from the company of Tri State who brokered the loan"; and

19.    "Defense counsel failed to present evidence, fully develop evidence, and respond to misleading testimony so that Jeremie Sheneman was not provided a defense."

[DE 138]. Mr. Holesinger argues that given these deficiencies, Jeremie Sheneman's choice of

---

[2]Jeremie Sheneman appears to argue that an expert witness should also have been called to testify to the requirements of a subprime mortgage. *See* DE 138 at 2.

defense was not presented by counsel, and consistent with *Jones v. Barnes*, 463 U.S. 745 (1983), Jeremie Sheneman was denied his Sixth Amendment right to "select [his] attorney and to make [his] own decisions regarding the conduct of his defense." [DE 138-1 at 2]. Mr. Holesinger asserts that a new trial should be granted on this basis.

The government opposed the defendant's request for a new trial, detailed the trial evidence that refuted Jeremie Sheneman's position, and argued that Jeremie Sheneman has failed to meet his burden in demonstrating that Mr. Truitt was ineffective, that Jeremie Sheneman was prejudiced by Mr. Truitt's performance [DE 140], or that the evidence was insufficient to sustain the convictions [DE 66].

A review of the evidence introduced at trial is necessary for the Court to effectively consider the multitude of claims raised by Jeremie Sheneman.

## II. The Trial

*Government's Theory of the Case*

The overarching fraudulent mortgage scheme claimed by the government was that from 2003 through 2005, Jeremie and Michael Sheneman duped four unsuspecting and unsophisticated buyers into buying a total of sixty investment properties, with the proceeds of the sales going to the Shenemans.

To make the scheme successful, the Shenemans needed homes to sell, buyers to purchase the homes, and lenders to provide financing to the buyers. To get the homes, the Shenemans either purchased homes outright or obtained a power of attorney from sellers who wanted the Shenemans to sell their homes for them. To get the buyers, the Shenemans convinced four individuals to purchase properties by misrepresenting that the homes were in rentable condition,

6

prohibiting access to the inside of the homes, selling properties other than the properties that the buyers expected to purchase, misrepresenting that the properties would have tenants, and falsely offering to help the buyers find tenants, assist with managing the properties, and even buy-back the homes should their investment flounder.  To get the lenders to issue subprime residential mortgage loans, Michael Sheneman provided the financial backing to pad the buyers' bank accounts and paid for the closings costs and down payments, while Jeremie Sheneman used his employment at Tri State Mortgage and Superior Mortgage to place false information in the loan documents relative to the buyers' employment income, assets, and citizenship, the source of the funds, the intended use of the properties, and the identity of the loan officer conducting the buyer interviews and completing the loan applications (who in reality was Jeremie Sheneman).  According to the government, the buyers never saw the completed loan applications until closing, at which time the buyers were closing on several homes and signing vast amounts of documents without reading them.  After the mortgages issued, the four buyers discovered that many of the properties purchased through the Shenemans were in a state of disrepair and were not generating rent, and any assistance promised by the Shenemans was a farce.

*Defendants' Theory of the Case*

The defense theory was that although Jeremie Sheneman worked for two years at Tri State Mortgage as a loan officer, he was never an employee at Superior Mortgage.  Instead, the Shenemans were sellers of homes.  They bought properties, rehabilitated them, and sold them for a profit.  The Shenemans claimed that their names never appeared on any of the residential loan applications (except on some purchase agreements where they were identified as the sellers), they were not responsible for completing the loan applications, and they did nothing illegal by

assisting buyers with closing costs given the buyer-assisted subprime lending program that was available at the time. The Shenemans also argued that they did not provide false information to the buyers who could have demanded to inspect the properties, the closing packet, and the appraisals before making any purchase, and who could have walked away from any deal at any time.

The Shenemans maintained that it was the borrowers who verified that the information contained in the loan applications and closing documents was truthful. And further, had the lenders sought verification of the information contained in the loan applications, then they would have discovered the false information (which was not provided by the Shenemans). The Shenemans argued that their rehabilitating and selling homes did not put them in a position to guarantee that the buyers would be able to consistently pay the mortgages.

*The Evidence*

At trial, the government presented the testimony of Ms. Elinor Tyl, Mr. Eric McGinness, and Mr. Kevin Shaw, who sold houses to the Shenemans or who provided a power of attorney to the Shenemans to sell their homes.

Ms. Tyl testified that she owned six rental properties and she reached an agreement to sell them to Michael Sheneman for a bulk price that was sufficient to pay off the mortgages and taxes. As part of the sale, Ms. Tyl executed a power of attorney to Michael Sheneman because she could not attend all of the closings, but she understood that Michael Sheneman was buying the houses from her. Ms. Tyl knew nothing about the mortgage proceed checks issued to her and endorsed with her signature (but not actually signed by Ms. Tyl) with directions to pay to the order of Michael Sheneman.

Similarly, Mr. McGinness owned twelve rental properties and Jeremie Sheneman agreed to buy two of his homes. Mr. McGinness was under the impression that he was selling the houses to Jeremie Sheneman. With respect to one of the homes, he executed a quit-claim deed to Jeremie Sheneman and he signed a closing statement which listed Mr. McGinness as the seller and Jeremie Sheneman as the buyer. However, the evidence also showed that on the same property he executed a power of attorney and that a check for the mortgage proceeds was issued to Mr. McGinness which Mr. McGinness never saw—it was endorsed (although not by him) with directions to pay to the order of Jeremie Sheneman..

Mr. Shaw's story was consistent with the other sellers. Mr. Shaw owed thirty-five rental properties in the area and testified that he sold twenty-four of his properties to Michael Sheneman. Only after the closings did Mr. Shaw realize that the homes were not going directly to Michael Sheneman, but instead, were sold directly to buyers that he never met. Mr. Shaw testified that he executed a power of attorney to Michael Sheneman for only one property and that he was not aware of the check for the mortgage proceeds which was issued to him and endorsed with directions to pay to the order of Michael Sheneman.

Cross examination of the sellers revealed that Ms. Tyl, Mr. McGinness, and Mr. Shaw suffered no economic loss from their transactions with the Shenemans, and in fact, they admitted to getting what they bargained for with the Shenemans. Further, the sellers believed that their homes were in good condition when they were sold.

The government presented the testimony of the four buyers who bought the sixty properties during the course of the scheme, Ms. Gladys Zoleko, Mr. Paul Davis, Mr. David Doolittle, and Mr. Gary Denaway. Their stories were also consistent.

Ms. Zoleko, a citizen of the Republic of Cameroon, came to the United States on a student visa. In need of more money to support her family back home, she was introduced to Jeremie Sheneman at Superior Mortgage who told her about the money she could make being a landlord, indicated that he was selling houses that belonged to himself and Michael Sheneman, and informed her that she would not have to pay the down payments. Jeremie Sheneman then had Ms. Zoleko sign her name to a blank application. She never signed another document, including purchase agreements (wherein her signature later appeared), until closing. Further, despite loan documents which indicated that she was a citizen of the United States, Ms. Zoleko testified that she was never asked about her citizenship. She also never indicated that 726 South Brookfield was going to be her primary residence, but the loan application indicated that it would be a primary residence. Similarly, she was never interviewed by Andy Beam, even though her loan applications indicated she was. In fact, Ms. Zoleko testified that she never filled out a single loan application.

After going around with Michael Sheneman to see homes, although he would not allow her to go inside or write down the addresses, she met with the Shenemans at Superior Mortgage. During this meeting, Jeremie Sheneman recommended that she buy thirty homes; a prospect apparently so absurd that Michael Sheneman rolled his eyes and left. Ultimately, she decided to purchase only fourteen homes. At the closings, Michael Sheneman gave Ms. Zoleko the down payment checks and indicated that he and Jeremie Sheneman were paying the down payments for her. In the end, Ms. Zoleko purchased some homes that she had not selected and were in terrible condition. Ms. Zoleko testified that Jeremie Sheneman had given her false assurances

concerning the help he would provide relative to renting out the properties, fixing-up the properties, and reselling them if she decided to get out of the landlord business.

Mr. Paul Davies also testified that he came to the United States from the Republic of Liberia on a student visa. When Mr. Davies met with Jeremie Sheneman at Superior Mortgage in August 2005 to purchase rental properties, Mr. Davies stated that he signed only one piece of paper, never filled out any loan applications, never indicated that he was a citizen of the United States, and never signed any other documents until closing (even though his signature appeared on other documents including purchase agreements). The Shenemans took Mr. Davies to see properties but would not let him go inside the homes because they were allegedly occupied with renters. Mr. Davies bought thirteen or fourteen properties, and he never paid any down payments because the Shenemans made the payments.

One of the homes that Mr. Davies purchased was located at 1922 West 6th Street, Mishawaka, Indiana. Mr. Davies testified that the loan application for this property falsely identified that he had fifteen thousand dollars of his money in the account, that he was a citizen of the United States, and that he was interviewed by Andy Beam for purposes of filling out the application. In fact, he never met with anyone other than Jeremie Sheneman at Superior Mortgage. Mr. Davies testified that even though he had a right to receive the appraisal before purchasing the home, he was told that Jeremie Sheneman had his own appraiser and that Jeremie would take care of everything. Mr. Davies testified that the purchase of all of his properties went the same way. In the end, Mr. Davies discovered that Jeremie Sheneman was not truthful when he told Mr. Davies that he was buying the properties that he had selected, the homes were

in good condition, most homes had tenants or he would help him find tenants, and the Shenemans would buy back the properties if the investment did not work out.

Mr. David Doolittle testified that after contacting Michael Sheneman to get involved with purchasing rental properties, Michael referred him to Jeremie Sheneman at Tri State Mortgage so that Jeremie could fill out his credit and loan application. Mr. Doolittle recalled filling out only one credit application without a property address attached to it, and he testified that he did not sign any others applications and he did not sign any other documents until closing. Thereafter, Jeremie Sheneman told Mr. Doolittle that he had signed Mr. Doolittle's name which was difficult to replicate. Mr. Doolittle confirmed that even though his loan applications indicated that the down payments were from his account, the money came from Jeremie Sheneman to make it look like he had enough money to buy the houses. The money was then used at the closings. Mr. Doolittle testified that he did not have interviews with Joel Chimel or Brenda Buck, even though his loan applications reflected that he did. Ultimately Mr. Doolittle bought twenty-one properties, not all of which were from the Shenemans, after Jeremie Sheneman gave him false reassurances that the rentals would be in good condition and would have renters. Mr. Doolittle testified that he never had a chance to look at the appraisals for the houses he purchased, and that every one of his loans was processed through Tri State Mortgage and Jeremie Sheneman.

Mr. Gary Denaway contacted Michael Sheneman to get involved in the rental property business, which led to Mr. Denaway's contacting Jeremie Sheneman, a finance officer at Tri State Mortgage. Mr. Denaway did not fill out any forms, but he signed them. Per Mr. Denaway's testimony: Jeremie Sheneman told Mr. Denaway that forty-five thousand dollars of

Michael Sheneman's money was placed in his account to make his credit appear acceptable; even though Mr. Denaway lost his job, Jeremie Sheneman created a false employer so Mr. Denaway would get approved for the loan; and, Mr. Denaway was never interviewed by Jeff Walsh or Brenda Buck, despite the fact that his loan applications indicated otherwise. Ultimately Mr. Denaway purchased ten homes, not all of which he was able to see before closing because he was told that either a maintenance man was working on them or the key was not available. Mr. Denaway testified that he never received any of the appraisals until after the closing, because Jeremie Sheneman always said he forgot them or Jeremie Sheneman did not show up at the closings. In addition, Mr. Denaway was falsely told that the properties were in rentable condition, and Michael Sheneman indicated he would buy back the properties if Mr. Denaway was not happy.

On cross-examination, the buyers acknowledged signing documents at the closings which indicated that they had a right to review the appraisals, many of which showed that the properties were in good condition and were being rented. The buyers also admitted that they could have insisted on seeing the properties before closing and that they had the ability to walk away from any deal. Further, several Truth in Lending Statements revealed that the mortgage payments were less than the rents being generated, and purchase agreements indicated that the sellers could pay up to 5% or 6% of the closing costs, not to exceed 10% of the amount financed. Ultimately, the buyers decided to take the investment risk because they were all hoping to make money with their investments, but instead, the buyers testified that the homes went into foreclosure or the banks took the deeds in lieu of foreclosures.

The scheme was supported by the testimony of Ms. Tanya Boettcher and Ms. Lauren Duesler, who were loan processors at Superior Mortgage[3] and worked with Jeremie Sheneman, a loan officer at Superior Mortgage beginning in late 2004.[4] Ms. Boettcher and Ms. Duesler testified that after a loan officer gathered the application information from the buyer, their jobs required them to generate a typed copy of the application, verify the information and communicate with lenders, package the file, send the file to the mortgage company, and schedule closings. However, they explained that Jeremie Sheneman's files were handled differently. Jeremie Sheneman worked late evenings and when they returned to work the following morning, Jeremie Sheneman left files on their desks.

Further, Ms. Boettcher explained that unlike other loan officers, Jeremie Sheneman gave her copied loan applications instead of originals, he typically closed loans within two weeks when most loans took thirty days to close, and he processed 25-50% more loans than other loan officers. She testified that Jeremie Sheneman was able to get loans processed so quickly because he sometimes processed loans himself and he worked directly with the lenders, which was really her job. Ms. Boettcher testified that Jeremie Sheneman always used Argent Mortgage Company as the lender.

Ms. Duesler similarly testified that Jeremie Sheneman kept control of his files and he would send information directly to the lenders, including conditions, appraisals, and title work.

---

[3]After leaving Superior Mortgage in June 2005, Ms. Boettcher was processing loans for someone else in October of 2005, when she learned that her name was still being used in connection with loan applications generated from Superior Mortgage.

[4]Mr. Truitt impeached Ms. Duesler's testimony with the summary of her statement to government agents, which reflected that she told the agents that Jeremie Sheneman was a loan officer assistant to Andy Beam, the owner of Superior Mortgage.

Ms. Duesler testified that she became familiar with Jeremie Sheneman's handwriting because he left handwritten notes on her desk every day with his files, and as such, Ms. Duesler was able to identify Jeremie Sheneman's handwriting on four loan applications for Ms. Gladys Zoleko. Ms. Duesler did not recognize the interviewer's signature on the applications to be Jeremie Sheneman or Andrew Beam's signature (which she was familiar with); however, the typed versions of the applications, done by Jeremie Sheneman, reflected that Andrew Beam was the interviewer. In working on Jeremie Sheneman's loan files, Ms. Duesler saw blank purchase agreements that contained borrower's signatures and she observed Jeremie Sheneman cut and paste borrower and seller signatures onto purchase agreements. Specifically, she testified that Jeremie Sheneman would cut the seller's signature from a purchase agreement and paste it onto a purchase agreement that he completed after the buyer signed the blank agreement. Ms. Duesler confirmed that most of the loans she processed for Jeremie Sheneman were subprime loans.

Relative to Michael Sheneman, Ms. Duesler testified that Michael told her that he was part owner of Superior Mortgage and that he and Jeremie Sheneman were selling some of his (Michael Sheneman's) houses. Ms. Duesler also saw Michael Sheneman use an office at Superior Mortgage, receive telephone calls at Superior Mortgage, and sit with buyers at the office with Jeremie Sheneman while Jeremie filled out loan applications for the buyers. Ms. Duesler once observed Michael and Jeremie Sheneman accompany a buyer to the bank in order get a cashier's check for closing.

The government also presented the testimony of Mr. Eric Oswald and Mr. Steve Newcomb, both of whom were familiar with the mortgage industry at the time, the process of obtaining mortgages, and the process by which mortgage companies decided whether to provide

financing for a real estate purchase.

Mr. Eric Oswald, experienced in underwriting and the mortgage lending industry in the local area, explained that a mortgage broker was the middleman between the borrower and the lender in securing funding for a loan, a loan officer working for a mortgage brokerage met with the borrower and completed the information on the loan application, and a loan processor gathered documents that the lender would want to review before underwriting the mortgage. Mr. Oswald testified that about a month after closing, the borrower's credit report would reflect a mortgage issued on a property. He also explained that a power of attorney used to sell a particular property did not become part of the chain of title on the property, but if recorded in the recorder's office, which was done in this case, then the power of attorney would be found upon conducting a title search.

Mr. Steve Newcomb, a Repurchase and Title Claims Manager with Argent Mortgage Company from March 2004 until August 2007, testified that Argent was a subprime wholesale residential lender, meaning they did not work directly with the borrower but relied on the loan submission package (which included a copy of the purchase agreement) from an approved mortgage broker to determine the borrower's capacity to repay the loan. Argent made most of its money in the secondary market by subsequently selling mortgages to large institutional lenders.[5]

Mr. Newcomb explained the importance of the information in the loan application which the lender relied on to evaluate a borrower's credit history, capacity to repay, and collateral.

---

[5]Mr. Newcomb explained that buyers in the secondary market would review the same loan application and packets that Argent and other subprime lenders had received, and would conduct a forensic audit on a sample of the loans received from subprime lenders. In 2007, when many loans created in 2003-2005 were defaulting, subprime wholesale lenders were forced to repurchase many defaulted loans and sell the loans at a loss in the sub-secondary market as a "scratch-and-dent."

This information was important whether the loan was going to be prime or subprime loan. Specifically, Mr. Newcomb testified that:  a borrower's assets needed to be disclosed in order to show whether the borrower had the requisite funds on deposit to close the loan; the schedule of real estate owned was important to show the borrower's other mortgage liabilities which are balanced against the borrower's income (including any rental income) for purposes of calculating the borrower's debt-to-income ratio; the source of the borrower's down payment was very important because only a borrower's own funds or gift funds from an immediate family member were acceptable to show that the borrower had a stake in the transaction (thereby making a default less likely); employment information was necessary to show that the borrower had the capacity to repay the loan and normally at least two years of employment was required to show stability in job history (and if a borrower was not employed then the loan would be denied); the citizenship of the borrower was important because if the borrower did not have permanent roots in the United States then it would be considered a high risk factor and the loan would likely be for a lesser amount with a higher interest rate; and, the name of the interviewer must be disclosed in the loan application because it shows that the mortgage broker or the loan officer for the broker is attesting to having completed the application (and if the broker was also the buyer or seller, then most likely the loan would not get approved due to a conflict of interest). Mr. Newcomb indicated that a seller was allowed to contribute to closing costs, however, no part of the down payment could be borrowed and any gift funds for the down payment had to be from an immediate family member.

Mr. Newcomb testified that mortgage brokers became familiar with or knew the lending criteria of Argent and other subprime lenders.  He also testified that in 2003 through 2006, when

the subprime lending industry grew, trillions of dollars were changing hands in the subprime mortgage business, the lending guidelines were loose, and it became easier to get financing because the lenders were extending credit based on lax internal subprime lending guidelines.

FBI Special Agent Tim Theriault was the lead agent in the investigation of the Shenemans. In interviews with Agent Theriault, Michael Sheneman stated that he had no affiliation with the mortgage loan process and he knew that he was not allowed to pay the down payments because it would be "illegal." Michael Sheneman also admitted to paying all of the closing costs for Mr. Davies and Ms. Zoleko, but he denied paying the down payments. Agent Theriault testified that his investigation revealed that Jeremie Sheneman was once a loan officer at Tri State Mortgage and a loan originator and processor while at Superior Mortgage.[6]

Jeremie Shenemans' previous trial testimony,[7] admitted through Agent Theriault, indicated that Jeremie Sheneman worked as a loan officer for two years at Tri State Mortgage and he knew that lenders were going to rely on the information he put in loan applications, specifically including: the intended use of the property and the borrower's monthly income, assets, liabilities, real estate owned, and credit score. Jeremie Sheneman knew that the lender wanted to know if the borrower would be able to pay back the loan, and he knew that lenders were more inclined to lend and provide a lower interest rate on a primary residence because the

---

[6]Mr. Truitt attempted to get Agent Theriault to testify that Jeremie Sheneman did not work at Superior Mortgage given that Jeremie Sheneman did not receive any salary or compensation from Superior Mortgage.

[7]Jeremie Sheneman was prosecuted in a previous case, 3:10-cr-120, which went to trial. During the trial, Jeremie Sheneman testified on his own behalf. On March 30, 2011, the jury convicted Jeremie Sheneman of three counts of wire fraud involving a scheme in which Jeremie Sheneman fraudulently secured approximately four million dollars in mortgage loans by misrepresenting the assets, liabilities, and other material information on mortgage loan applications submitted in his grandmother's name. Relevant portions of Jeremie Sheneman's testimony from the trial in 3:10-cr-120 were introduced in the present case without informing the jury that the prior testimony was given during a criminal proceeding and without objection.

borrower would be more likely to take care of the property.

Richard Urbanowski, a forensic auditor with the U.S. Department of Housing and Urban Development, analyzed the financial records involved in the case and testified that in reality every cent of the down payments required for all sixty properties purchased by Mr. Davies, Mr. Denaway, Mr. Doolittle, and Ms. Zoleko came from Michael Sheneman (minus some fees incurred for Ms. Zoleko's properties). In addition, of the sixty properties purchased by the four buyers, virtually all of the mortgages (excepting four of Mr. Davies' properties) were brokered through Superior Mortgage or Tri State Mortgage, where Jeremie Sheneman worked.[8] Mr. Urbanowski also analyzed the amount of money that was placed into the four buyers' accounts by Michael Sheneman, which included $20,000.00 to Mr. Davies (whose account balance was $869.00), $45,000.00 to Mr. Denaway (whose account balance was $694.00), $25,000.00 to Mr. Doolittle, and $18,000.00 to Ms. Zoleko (whose account balance was $234.00). Mr. Urbanowski told the jury that the proceeds of the sales often went to Michael Sheneman, yet from June through October 2005, a total of $645,854.55 was transferred from Michael Sheneman's accounts to Jeremie Sheneman's accounts (although this amount was not actually traced from the money made from the property sales). Jeremie Sheneman actually received $360,099.61 in direct sale proceeds to his personal bank account [Government's exhibit 47]. Mr. Urbanowski also discussed the wire transfers that were described in counts 1-4 of the indictment, which involved the wiring of the mortgage funds to the title company and resulted in the sale proceeds being wired from the title company to Michael Sheneman's bank account [Government's

[8]On cross-examination, Mr. Urbanowski testified that he concluded that Jeremie Sheneman worked at Superior Mortgage based only on interviews and information received from case agents. Mr. Urbanowski admitted that Jeremie Sheneman's name does not appear on any loans originated from Superior Mortgage and he had no evidence that Jeremie Sheneman ever received any commission checks from Superior Mortgage.

exhibits 37-40].

The defense presented the testimony of Mr. Jonathon Farkas, Jeremie Sheneman's high school friend, who worked from October 2004 to January 2007 at Argent Mortgage explaining Argent's lending guidelines to lenders. Mr. Farkas testified that 80-85% of Argent's business was subprime lending which involved programs focused on non-seasoned and non-sourced loans because they were dealing with credit-challenged borrowers. He agreed that Argent looked primarily at credit, collateral, capacity, and character for approving a loan and that Argent often relied on the appraisal ordered by the broker to know the real estate's value. Mr. Farkas confirmed that it was typical for sellers to pay up to 5% of closing costs and that the settlement statement would supercede the purchase agreement. Mr. Farkas also confirmed that Argent records would show that Michael Sheneman was never an owner of Superior Mortgage and that Jeremie Sheneman was never a loan officer at Superior Mortgage.[9] By early 2006, Superior Mortgage was in a "disapproved state" with Argent, which meant that Argent was no longer accepting loans from Superior Mortgage because as the economic times changed Argent had to focus on brokers that were producing more profit for Argent.

The jury heard testimony from Mr. Amado Tanguma, who from 1998 to 2005 was a mortgage loan officer for Michiana Mortgage, during which time he originated approximately one hundred subprime loans. Mr. Tanguma was aware of a seller-assisted program that allowed the seller to pay closing costs. Mr. Tanguma testified that oftentimes the lender did not care how long the borrower's money sat in the account (otherwise known as the seasoning of funds) or

---

[9]Mr. Farkas testified that Mr. Joel Chimel also worked for Argent as an account executive; however, Mr. Chimel was not a loan officer at Superior Mortgage and it was highly unlikely that he would have conducted a face to face interview with a borrower at Superior Mortgage. Notably, Mr. Chimel also worked at Tri State Mortgage with Jeremie Sheneman.

where it came from (otherwise known as the source of funds) because the loan was going to be resold. In Mr. Tanguma's experience, at closing, the closing agent would have the borrower review the loan application and verify that the information was correct and no additional documentation was required if a borrower indicated that he or she was a citizen of the United States.

On cross-examination, Mr. Tanguma admitted that while he was a loan originator he never forged any buyers' signatures on any loan applications, never put money in the borrowers' bank accounts to increase the amount reflected on the loan applications, never omitted other properties owned by the borrower, never indicated that someone was a United States citizen when they were not, and never indicated that the interview of the borrower was conducted by someone other than himself. Lastly, Mr. Tanguma never knew if Jeremie Sheneman ever did any of these things because he did not even know Jeremie Sheneman.

Mr. Carl Newborn testified that he is a real estate investor who purchases real estate, rehabilitates the properties, and resells them. He too was aware of a seller-assisted program during the relevant time frame that allowed the seller to pay financing costs of up to 10% of the loan. In fact, he provided assistance to buyers on some of the homes that he sold, however, he never paid the down payment for any of his buyers. Mr. Newborn was specifically familiar with the property located at 1801 Carlisle Street, which he brought with the financial assistance of Michael Sheneman. He also recalled reselling the home by using a power of attorney and meeting Michael Sheneman at Superior Mortgage. Further, Mr. Newborn knew Jeremie Sheneman though Michael Sheneman and was aware that Jeremie Sheneman "used to do mortgages at Tri State Mortgage."

Mr. Randy Herring, a real estate appraiser of ten years, conducted approximately a dozen appraisals for Michael Sheneman and up to one hundred appraisals for Tri State Mortgage. Mr. Herring testified that when dealing with the type of loans made in this case he would have been hired by the lender. Mr. Herring testified that if a property was not owner-occupied, he would conduct a rent schedule to determine the rental income that might be generated by a particular property. He also identified an appraisal that he conducted on January 30, 2004 for a property located at 1237 College Avenue, which reflected that the home was renovated. A second appraisal, paid for by the mortgage insurance company, concluded that Mr. Herring's appraisal was accurate.

Mr. Kenneth Brown testified on behalf of the defendants as well. Mr. Brown indicated that he worked for Jeremie Sheneman by locating homes that were for sale. Mr. Brown would then rehabilitate the homes and manage the properties for Jeremie Sheneman. Mr. Brown was proud of his work which had to be up to Section 8 standards before he got paid. Mr. Brown recalled some of the homes that Ms. Zoleko purchased as being "up to par."

### III. Rule 33 Standard

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The motion is addressed to the discretion of the court and the power to grant a new trial should be invoked only in the most extreme cases. *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998), *cert. denied*, 525 U.S. 897 (1998); *United States v. Gonzalez*, 93 F.3d 311, 315 (7th Cir. 1996) (citations omitted).

On a motion for a new trial, the court does not need to view all evidence in favor of the government, "[r]ather, the court considers whether the verdict is against the manifest weight of

the evidence, taking into account the credibility of the witnesses." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999), *cert. denied*, 533 U.S. 961 (2001).  A court must grant a new trial if that evidence "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *id*. at 658 (citation omitted), or where "trial errors or omissions have jeopardized the defendant's substantial rights." *United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (citation omitted).

Further, if the court reaches the conclusion that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he has the power to set the verdict aside," even if no erroneous rulings were made at trial. *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citing *United States v. Morales*, 902 F.2d 604, 605-06 (7th Cir. 1990), *amended*, *United States v. Morales*, 910 F.2d 467 (7th Cir. 1990)).  "If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial." *Id*.

## IV.  Discussion

### A.  Ineffective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. An attorney must not only be present with a criminal defendant at his trial, but must assist the defendant in a way that ensures the trial is fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  A fair trial is one in which the adversarial process functions properly to produce a just result. *Id*. at 686.

To prevail on a claim for ineffective assistance of counsel, Mr. Sheneman must first demonstrate that counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 688). "This means identifying acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir. 2011)). Further, "there is a strong presumption that [the defendant's] attorney performed effectively," *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted). The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citation omitted).

Even if counsel's performance was deficient, Mr. Sheneman must also demonstrate that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694);

*United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (quoting *Strickland,* 466 U.S. at 694).

"In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein*, 460 F.3d at 848 (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)).

Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *Velarde v. United States*, 972 F.2d 826, 828 (7th Cir. 1992); *see Strickland,* 466 U.S. at 687 (reasoning that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."). In fact, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*.

Considering the entirety of Jeremie Sheneman's objections to Mr. Truitt's performance and the extensive record of this case, the Court concludes that these alleged omissions completely fail to satisfy the two requirements in *Strickland* for showing ineffective assistance of counsel.

### *Deficient Performance*

To show deficient performance, Jeremie Sheneman must show Mr. Truitt's representation fell below an objective standard of reasonableness. *Koons*, 639 F.3d at 351

(quoting *Strickland,* 466 U.S. at 688). There is a strong presumption of competence. *Berkey*, 318 F.3d at 772.

Jeremie Sheneman places significant emphasis on Mr. Truitt's alleged failure to introduce mitigating evidence at trial. However, the evidence that Jeremie Sheneman identifies as not having been introduced at trial was in fact admitted into evidence.

In particular, Jeremie Sheneman complains that Mr. Truitt should have introduced evidence relative to the loan applications, the purchase agreements, the appraisals, the fact that other sellers and mortgage companies were involved, and the legal use of a power of attorney. Yet, these items were admitted into evidence and incorporated into the presentation of Jeremie Sheneman's defense.

For instance, the documentary evidence admitted into evidence included various purchase agreements [Defendant's Exhibits M-4, M-7, M-11, M-14, M-17, M-18, M-19, M-20, M-25]. Of the purchase agreements that were introduced into evidence, the purchase agreements for the four properties identified in counts 1-4 of the indictment were also admitted [Defendant's Exhibits M-4, M-7, M-11, M-14]. These purchase agreements specifically identified the fact that the properties were being sold "as is" without further inspection and that the seller was allowed to pay 5% of the closing costs not to exceed 10% of the amount financed. *Id.* Importantly, the purchase agreements further identified Mike Lee as the seller of the properties contained in counts 1-3 of the indictment (726 South Brookfield Street, 1246 Diamond Avenue, and 505 North Walnut Street) [Defendant's Exhibits M-4, M-7, M-11], and the defense submitted the Limited Power of Attorney that Michael Sheneman had to sell these homes on Mr.

Lee's behalf [Defendant's Exhibit M-29].[10]  Also, the purchase agreement for the property

contained in the remaining count of the indictment (1922 West 6th Street), identified Michael

Sheneman as the seller [Defendant's Exhibit M-14].  Thus, the purchase agreements and the

information they contained were submitted to the jury.

Moreover, Mr. Truitt explained to the jury the role of purchase agreements in real estate

transactions, by stating: "[t]here are sale contracts for each and every one of these properties.

And there's not a whole lot of rules for sales contracts.  You can agree to do a lot of things,

including pay part of the closing costs, to assist the buyer in completing the loan, that's not

illegal." [Trial Transcript Volume I at 38-39].  Therefore, any contention that the jury did not

understand the role of the purchase agreements or did not know about their contents is without

merit.

Similarly, several appraisal reports were admitted [Government's Exhibits 11, 12;

Defendant's Exhibits M-3, M-9, M-12, M-16, M-23, M-28], including the appraisals that were

completed on the four properties identified in counts 1-4 of the indictment [Defendant's Exhibits

M-3, M-9, M-12, M-16].  Along with these appraisal reports, the defense offered into evidence

the notices which informed the borrowers of their right to receive a copy of the appraisal

report— including the notices which contained the purported signatures of Ms. Zoleko and Mr.

Davis [Defendant's Exhibits M-2, M-8, M-15], who bought the four properties identified in

counts 1-4 of the indictment.  Mr. Truitt further explained to the jury the role of the appraisals by

---

[10]In fact, other Limited Powers of Attorney were admitted into evidence which were given by Ms. Tyl and Mr. Shaw [Defendant's Exhibits M-1, M-30], along with an agreement between Ms. Tyl and Michael Sheneman which indicated that her properties were being sold to Michael Sheneman with the understanding that they would be purchased by another buyer, and that no one was to have direct contact with the tenants of her six properties [Defendant's Exhibit M-31].

stating:

> And there's another safeguard: an appraisal. Banks are going to require an appraisal. So a certified appraiser is going to have to go out, examine that house, examine similar houses in that area, and come back with an opinion, a professional opinion, as to how much that house is worth. And if the purchase price is more than what the appraisal shows, they are going to have to adjust the purchase price. So the seller is going to take less and he will agree to take what the appraisal shows. Based on all of that, the lender makes a decision: Yes, I'm going to fund this loan. No, I'm not going to fund this loan. Or, I may fund this loan after I receive certain other information . . . Now, what was happening in a lot of these loans, which is beyond the control of Jeremie or Michael Sheneman, is that the banks weren't asking for this additional proof. Had the right to, but didn't.

[Trial Transcript Volume I at 39-40]. Again, the jury was provided the relevant information concerning the appraisal reports and the information which would allow the jury to conclude that the buyers knew about their right to receive and review copies of the appraisals.

Further, almost thirty residential loan applications were admitted into evidence during the course of the trial [Government's Exhibits 1-5, 8, 9, 13, 14, 18-31; Defendant's Exhibits J-1, J-2, J-3]. Of those loan applications admitted at trial, the loan applications for the four properties identified in the indictment were admitted, along with their respective settlement statements [Government's Exhibits 9, 27, 30, 31].[11] The settlement statements explicitly revealed that F&S Properties LLC was the seller of the properties that Ms. Zoleko purchased, as identified in counts 1-3 of the indictment; and, that Michael Sheneman was the seller of the property that Mr. Davies purchased, as identified in count 4 of the indictment [Government's Exhibits 9, 27, 30, 31]. These settlement statements also showed that Mr. Davies' mortgage (count 4) was financed by Homecomings Financial Network, Inc., and that Mr. Zoleko's mortgages were financed by

---

[11]These loan documents were completed with typed responses, with the exception of the loan application for 726 South Brookfield Street, as identified in count 3 of the indictment, which contained handwriting identified by Ms. Duesler as Jeremie Sheneman's [Government's Exhibit 27].

Argent Mortgage Company (count 3) and Meritage Mortgage Corporation (counts 1 and 2). *Id.*

Thus, despite Jeremie Sheneman's argument to the contrary, this information was submitted to the jury for their deliberations and very clearly reveals that other sellers and mortgage companies were involved, and that the properties were sold pursuant to what might appear to be legitimate loan applications, purchase agreements, appraisals, and powers of attorney.

These documents were introduced along with trial testimony which provided relevant background information for their admission—more evidence that Jeremie Sheneman overlooks when asserting that certain evidence should have been admitted but was not.

For instance, given the testimony of Ms. Tyl, Mr. McGinness, Mr. Shaw, and Mr. Newborn, there was no doubt that various sellers of property were involved and that there was nothing illegal about using a power of attorney to sell homes. Mr. Oswald and Ms. Tyl established that there was nothing unusual about using a power of attorney to sell properties. Mr. Oswald also established that while recorded powers of attorney (as these were) would show up in a title search for the property, the person given the power of attorney would not be identified as an owner of the property in the chain of title.

Despite the legitimate use of powers of attorney and the involvement of other sellers, the jury was also confronted with testimony which connected Jeremie and Michael Sheneman to the sale of all sixty properties by virtue of their being the actual sellers of properties or by their obtaining the power to sell properties for others. The testimony of Mr. McGinness, Mr. Shaw, and the four buyers, all indicated that they were under the impression that they were selling/buying the properties directly from/to Michael or Jeremie Sheneman. The four buyers

confirmed that they met Jeremie Sheneman at Tri State Mortgage or Superior Mortgage and signed their names to blank documents without filling out loan applications. They testified that Jeremie Sheneman took care of the rest. Jeremie Sheneman's previous sworn testimony confirmed that he worked as a loan officer at Tri State Mortgage, and the testimony of Ms. Boettcher and Ms. Duesler confirmed that Jeremie Sheneman worked as a loan officer at Superior Mortgage and oftentimes processed his own loans very quickly, which involved his cutting and pasting of signatures onto purchase agreements.

The defense countered this damaging testimony by having Agent Theriault and Mr. Urbanowski admit that Jeremie Sheneman's name never appeared on any loans originated from Superior Mortgage, and that there was no evidence that Jeremie Sheneman ever received any compensation from Superior Mortgage. Mr. Truitt further called Ms. Duesler's credibility into question by informing the jury that Ms. Duesler previously informed government agents that Jeremie Sheneman was only a loan officer assistant to Andy Beam. Defense witness, Mr. Farkas, was also presented. Mr. Farkas testified that having worked at Argent, he was personally familiar with the fact that Jeremie Sheneman was never a loan officer at Superior Mortgage.

Therefore, to argue that Mr. Truitt was deficient by failing to offer evidence which showed that Jeremie Sheneman did not work for Superior Mortgage and was not responsible for the information submitted on all of the loan applications is without merit.

Jeremie Sheneman also contends that Mr. Truitt failed to present mitigating evidence concerning the buyers and the lenders. Relative to the buyers, Jeremie Sheneman argues that Mr. Truitt failed to clarify that the buyers were not victims because they did not pay any down payments and ultimately suffered no losses. Relative to the lenders, Jeremie Sheneman argues

that Mr. Truitt failed to clarify that the lenders financed the mortgages knowing that these were subprime loans that fell within their guidelines, and failed to inform the jury that the lenders suffered no losses because they regained ownership of the properties after the buyers defaulted on the loans.

Little discussion need be devoted to Jeremie Sheneman's argument that Mr. Truitt failed to present evidence that the buyers were not victims and suffered no losses. There was overwhelming evidence that unsophisticated real estate investors Ms. Zoleko, Mr. Davies, Mr. Doolittle, and Mr. Denaway were duped into purchasing multiple properties at one time and ultimately spent time and money rehabilitating and renting out the properties. Despite this damaging evidence, cross-examination of the buyers revealed that they knew that they could have demanded to inspect the properties and appraisal reports before purchasing, and they knew that they could have walked away from any deal at any time. In addition, Mr. Tanguma was presented to tell the jury that at the closings of the properties, the borrowers review the loan applications and verify that the information is correct. Cross-examination further established that the buyers knew that the rental income (some of which was collected) was expected to exceed the mortgage payments, and they made the investment because they all hoped to make money in the end. The buyers all testified that upon their default, most of the lenders took the deeds in lieu of foreclosing. In fact, Mr. Truitt specifically argued this point in closing by stating:

> And, fortunately, most of them were fortunate enough to have the bank accept the home in lieu of the bank filing a foreclosure process. So they were not stuck with the deficiency judgment. They didn't have a debt collector going after them. Nobody has said their wages have been garnished or anything because of their mortgage loan. The bank, in a sense, forgives the loan; takes the property and hopefully tries to make as much as it can when the bank sells the property.

[Trial Transcript Volume IV at 165].  Again, Jeremie Sheneman's contention that Mr. Truitt was deficient in not making sure this mitigating evidence was introduced at trial is refuted by the record.

The Court turns to Jeremie Sheneman's argument that Mr. Truitt should have clarified for the jury that the lenders were issuing subprime loans based on subprime lending standards and based on the terms of the purchase agreements and contents of the appraisal reports.  The following discussion will show that this evidence was also submitted to the jury.

First, Ms. Duesler confirmed that most of the loans that she processed for Jeremie Sheneman were subprime loans, Ms. Boettcher confirmed that Jeremie Sheneman always used Argent Mortgage Company as the lender on the files that she processed, and Mr. Newcomb and Mr. Farkas confirmed that Argent Mortgage Company was a subprime wholesale residential lender.  Second, Mr. Tanguma, along with Mr. Newcomb and Mr. Farkas, testified about the lending requirements for subprime loans.  Their testimony consistently established that it became easier for credit-challenged borrowers to get financing because lenders were extending credit based on loose internal subprime lending guidelines.  Mr. Farkas's testimony further coincided with Mr. Newcomb's testimony that subprime lenders still looked to a borrower's credit, collateral, capacity, and character for approving a loan, and that the lender often relied on the appraisal ordered by the broker to know the real estate's value.  Although Mr. Newcomb seemed to place a greater emphasis on the lender's need to know the source and seasoning of funds, the testimony of defense witnesses Mr. Farkas and Mr. Tanguma established that subprime lending involved programs where the source and seasoning of the funds did not matter because the loan was going to be resold.  Further, Mr. Newcomb indicated that a seller was allowed to contribute

to closing costs; Mr. Farkas and Mr. Tanguma confirmed that it was typical for sellers to pay up to 5% of closing costs; and, Mr. Newborn testified that he was aware of a seller-assisted program that allowed the seller to pay financing costs of up to 10% of the loan. Third, aside from the loose lending practices and the type of loan, the testimony established that the lender was going to rely on the loan submission package, which included a copy of the purchase agreement, to determine the borrower's capacity to repay the loan. Fourth and finally, Mr. Truitt argued to the jury that Jeremie Sheneman complied with the lending standards at the time by stating in closing argument:

> Again, this process was started by a Contract to Purchase. Said that the seller could pay 5 percent of closing costs, and some of them say an additional 10 percent. This one says 5 percent, but there is nothing wrong with that. You heard the people from Argent say nothing wrong with the seller putting funds in a bank for a particular purchaser. Nothing wrong with that. Our rules and regulations at that time: No source/no seasoning. You don't have to put the name of who provided the money, and it doesn't have to be in the account for a certain specified period of time. Everything that was done in connection with the mortgage process and the closing of this loan was done according to Hoyle, by the rules and regulations in place at the time.

[Trial Transcript Volume IV at 166]. Once again, the record evidence establishes that the jury was aware that these were subprime loans, was aware of the lending requirements that subprime lenders used, and was aware that the lenders were given the loan file and purchase agreements before issuing the mortgages. Thus, no deficiency on the part of Mr. Truitt has been shown.[12]

---

[12]To the extent that Jeremie Sheneman argues that Mr. Truitt was ineffective for not calling a subprime lending expert, the Court finds the argument unavailing. First, Jeremie Sheneman has never proffered the testimony that would have been given by any such expert, and he has not identified a witness that would likely have been available to testify. *See United States v. Hattermann*, 853 F.2d 555, 559 (7th Cir. 1988) (defendant failed to present any evidence indicating that expert witnesses were available to testify with regard to his cancerphobia). Second, any further testimony concerning subprime lending would have been unnecessarily duplicative given the testimony of Mr. Newcomb, Mr. Farkas, and Mr. Tanguma. *See United States v. Monigan*, 128 F.3d 609, 612 (7th Cir. 1997) ("[i]t was entirely within counsel's discretion to decline calling a witness whose testimony he believed to be cumulative."). Third, assuming Mr. Truitt performed deficiently by not hiring a subprime lending expert, no prejudice resulted because a subprime expert was going to add nothing to the fact that lenders wanted to know their

Lastly, any argument that Mr. Truitt was ineffective for failing to make sure that the jury understood the difference that existed between closing costs and down payments, is frivolous. First, Agent Theriault testified that Michael Sheneman knew that he was not allowed to pay the down payments because it would be "illegal," but he did in fact pay all of the closing costs for Mr. Davies and Ms. Zoleko. Similarly, Mr. Newcomb, Mr. Farkas, Mr. Tanguma, and Mr. Newborn, all confirmed that sellers were allowed to pay a certain percentage of the closing costs, and the purchase agreements confirmed that no more than the 10% of the amount financed would be paid by the seller. However, Mr. Newcomb also noted that there were strict guidelines concerning the source of the down payments because the funds could not be borrowed and any gift funds had to be from an immediate family member. Defense witness Mr. Newborn testified that he never paid the down payment for any of his buyers.

Ultimately, there was no failure to explain to the jury that closing costs could be paid by the seller, but down payments could not. And thus, there was no deficient performance by Mr. Truitt in this respect.

The fact of the matter is, that despite evidence of its illegality, all of the buyers indicated that the down payments were paid for them by either Michael or Jeremie Sheneman, and the loan documents reflected that many of these down payments exceeded the amount set forth in the purchase agreements. And Mr. Truitt cannot be faulted for the strength of the government's case.

Although the Court has individually addressed Jeremie Sheneman's contentions of Mr.

---

risk of getting the loan paid back (regardless of whether the loans were conventional, subprime, or another type of loan), and any expert testimony was not going to change the fact that the subprime lenders' risk assessment was actually based on the false information in the loan applications that, per the buyers, Jeremie Sheneman provided.

Truitt's alleged deficient performance, the Court has considered Mr. Truitt's aggregate performance, including Jeremie Sheneman's catchall argument that "[d]efense counsel failed to present evidence, fully develop evidence, and respond to misleading testimony so that Jeremie Sheneman was not provided a defense" [DE 138 at 5]. *See Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) ("ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief."); *Washington v. Smith*, 219 F.3d 620, 635 (7th Cir. 2000) (the court must assess "the totality of the omitted evidence under *Strickland* rather than the individual errors") (citation omitted).

But the fact that Jeremie Sheneman might believe that his counsel could have or should have employed a different strategy when addressing certain factual issues at trial does not render his performance ineffective. *See Gentry v. Sevier*, 597 F.3d 838, 851 (7th Cir. 2010) ("[t]rial strategies are generally left to the discretion of counsel and second-guessing strategic decisions in hindsight will generally not be a meritorious basis to find ineffective assistance of counsel.") (citation omitted). In fact, Jeremie Sheneman has not even explained that there was a better way to handle the presentation of his case. It is Jeremie Sheneman's burden to identify the acts or omissions of Mr. Truitt that could not be the result of professional judgment such that Mr. Truitt's representation amounted to incompetence under prevailing professional norms. *Koons*, 639 F.3d at 351 (citation omitted). In considering Mr. Truitt's performance as a whole, Jeremie Sheneman has not met his burden in overcoming the presumption that, under the circumstances, the challenged actions were sound trial strategy and that Mr. Truitt's representation fell within

the wide range of reasonable professional assistance. *Id.* Thus, Jeremie Sheneman's Sixth Amendment right to effective representation was not violated.

### *Prejudice*

Even if Mr. Truitt's performance was deficient, Mr. Sheneman must also demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. In this case, the verdicts of guilty were overwhelmingly supported by the record, and no matter how deeply Jeremie Sheneman mines his contention that Mr. Truitt failed to effectively pursue his defense, he cannot demonstrate that he suffered any prejudice. In fact, other than crafting a long list of Mr. Truitt's alleged deficient conduct, Jeremie Sheneman never attempts to explain how Mr. Truitt's conduct impaired Jeremie Sheneman's defense or deprived Jeremie Sheneman of a fair trial, a trial whose result is reliable. *See Strickland*, 466 U.S. at 687. This alone is a basis to deny Jeremie Sheneman's request for a new trial because failure to show prejudice is fatal to Jeremie Sheneman's ineffectiveness claim. *Id.*; *Velarde*, 972 F.2d at 828.

In any event, the Court considers the totality of the evidence in weighing the effect of counsel's alleged errors. As extensively detailed herein, the jury heard evidence that the Shenemans secured houses for sale by owning them outright or acquiring control over them through a power of attorney. A power of attorney, even if filed with the recorder's office, did not have the Sheneman name appear in the chain of title. In addition, the sellers of their properties knew nothing about the mortgage proceed checks endorsed by them with directions to pay to the order of either Jeremie or Michael Sheneman.

The evidence also included the testimony of the buyers who described meeting with Jeremie Sheneman at Tri State Mortgage or Superior Mortgage, where per Ms. Boettcher and

Ms. Duesler, Jeremie Sheneman even processed his own loans. During the meeting with Jeremie Sheneman, the buyers signed their names to blank forms, or in Mr. Doolittle case he completed only one application. None of the buyers filled out or signed any other documents until closing—yet their signatures later appeared on documents that they did not sign; and, their loan applications, some of which contained Jeremie Sheneman's handwriting, falsely reported their income (or in Mr. Denaway's situation, falsely indicated that he had a job) and misrepresented their citizenship, the source of the funds, the intended use of the properties, and the identity of the loan officer who interviewed them and completed their loan applications. Sure, the buyers signed documents at closing attesting that these statements were true, but their testimony also established that they were not provided appraisals before closing and they were stuck signing mass amounts of documents on various properties without having sufficient opportunity to read the documents.

Mr. Newcomb testified as to the importance of the loan application information which the lenders relied on to assess their risk of lending. Even considering the evidence submitted which indicated that subprime lenders allowed sellers to pay closing costs and often cared little about the source and seasoning of funds, both Mr. Farkas and Mr. Newcomb testified that subprime lenders still looked at a borrower's credit, collateral, capacity, and character for approving a loan. In fact, Jeremie Shenemans' sworn testimony from his previous trial indicated that as a former loan officer at Tri State Mortgage, he knew that lenders were going to rely on the information in the loan application to determine if the borrower could repay the loan, specifically including information about the intended use of the property and the borrower's monthly income, assets, liabilities, real estate owned, and credit score.

Thus, even with loose lending practices and the availability of subprime lending programs, the jury was given strong evidence of the fact that Jeremie Sheneman knew that the subprime lender was going to rely on the loan submission package to determine the borrower's capacity to repay the loan.  In fact, Mr. Tanguma, a defense witness, told the jury that when he was a loan originator, he never forged any buyers' signatures on any loan applications, never put money in the borrowers' bank accounts to increase the amount reflected on the loan applications, never omitted other properties owned by the borrower, never indicated that someone was a United States citizen when they were not, and never indicated that the interview of the borrower was conducted by someone other than himself.

The jury also heard testimony that Michael and Jeremie Sheneman took the buyers to see properties that the buyers thought were owned by the Shenemans.  The buyers were not allowed to go inside of the homes for various reasons, but they were all given false assurances that the homes were in rentable condition and that the Shenemans would assist them in various ways with their investments.  The buyers further testified that they never paid the down payments, instead, Jeremie or Michael Sheneman paid the down payments.  Mr. Urbanowski confirmed that Michael Sheneman paid for all of the down payments and placed $20,000.00 into Mr. Davies' account, $45,000.00 into Mr. Denaway's account, $25,000.00 into Mr. Doolittle's account, and $18,000.00 into Ms. Zoleko's account, in order to make their account balances appear acceptable to lenders.

After the buyers were approved for financing and the mortgages issued, the buyers discovered that they purchased homes that they had not selected, homes that needed major repairs, and homes that did not have renters.  Although the buyers spent time and money

repairing the homes and finding renters, the lenders eventually took the homes in lieu of foreclosing.

The jury heard Mr. Urbanowski testify that during the course of the scheme Jeremie Sheneman received $360,099.61 in direct sale proceeds to his personal bank account, and from June to October 2005, Michael Sheneman transferred $645,854.55 from his accounts to Jeremie Sheneman's accounts. Mr. Urbanowski also explained to the jury how the wire transfers alleged in counts 1-4 of the indictment involved the wiring of the mortgage funds to the title company for Ms. Zoleko's purchase of 505 North Walnut Street, 1246 Diamond Avenue, and 726 South Brookfield Street (counts 1-3) and for Mr. Davies's purchase of 1922 West 6th Street (count 4), with the resulting sale proceeds being wired from the title company to Michael Sheneman's bank account.

The evidence of Jeremie Sheneman's guilt was overwhelming and he has not shown that Mr. Truitt's alleged inadequacies impaired his defense. Assuming that the entire constellation of Mr. Truitt's alleged errors constituted deficient performance, Jeremie Sheneman is unable to show with a reasonable probability that, but for Mr. Truitt's unprofessional errors, the result of the proceeding would have been different, or that there is a probability sufficient to undermine confidence in the outcome of the trial. *See Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694); *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (quoting *Strickland,* 466 U.S. at 694). Jeremie Sheneman's convictions resulted from the fact that the government presented ample and convincing evidence of his guilt, not because of any failure on the part of his attorney, whose performance at trial was thorough and professional.

The mere fact that counsel's defense strategy was unsuccessful does not render counsel's assistance constitutionally ineffective. *See Strickland*, 466 U.S. at 689.

Considering the entirety of Jeremie Sheneman's objections to Mr. Truitt's performance and the extensive record of this case, the Court concludes that Jeremie Sheneman has not satisfied the two requirements in *Strickland* for showing ineffective assistance of counsel, and there is no basis upon which to afford him a new trial.

**B.**     **Insufficiency of the Evidence**

Jeremie Sheneman's counsel has given short shrift to any contention that a new trial is warranted because the evidence did not support the convictions. However, a movant under Rule 33 bears the responsibility of developing his arguments and presenting the court with adequate grounds and authority to grant the relief requested, and this Court does not bear the obligation of researching and constructing the legal arguments open to the parties, especially when they are represented by counsel. *Beard v. Whitley County REMC*, 840 F.2d 405, 408-09 (7th Cir. 1988) (citation omitted). This is true even in the criminal context. *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (citing *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986)). The fact that  the sufficiency of the evidence claim is undeveloped, results in a waiver of the argument. However, the Court notes that such an argument would fail on the merits in any event.

To convict Jeremie Sheneman of wire fraud under 18 U.S.C. § 1343, the government had to prove that he: (1) knowingly participated in a scheme to defraud; (2) had the intent to defraud; (3) used materially false pretenses, representations or promises; and (4) used the wires in furtherance of the fraudulent scheme as alleged in the particular count of the indictment. *See United States v. O'Connor,* 656 F.3d 630, 644 (7th Cir. 2011); *Henningsen*, 387 F.3d at 589.

Again, as extensively summarized in this Order, the evidence offered at trial amply supported Jeremie Sheneman's convictions of wire fraud under 18 U.S.C. § 1343, as alleged in the four counts of the indictment. Jeremie and Michael Sheneman engaged in a fraudulent scheme that involved buying houses for a little and selling them for a lot, and they conducted the scheme as a team. Jeremie Sheneman falsified the loan documents which were sent to the lenders to secure the mortgages, and Michael Sheneman provided the financial backing to pay for the down payments and pad the buyers' bank accounts. Jeremie Sheneman fulfilled his role by working through Tri State Mortgage or Superior Mortgage, having buyers sign blank pieces of paper, and completing their loan applications and purchase agreements with copied signatures and materially false information, knowing what it took to get the subprime loans issued. Jeremie and Michael Sheneman told the buyers falsehoods to get them to buy into the investment scheme, purchase multiple properties sight unseen, and sign-off on closing documents without sufficient time for review. In the end, the proceeds of the sales went to Jeremie and Michael Sheneman, and the unqualified buyers and unsuspecting lenders were left with defaulted loans. The evidence of Jeremie Sheneman's guilt is more than sufficient, it is overwhelming.

Because there is simply no basis upon which to grant a new trial and the interest of justice does not require the Court to do so, the Court denies Jeremie Sheneman's request.

## V. Conclusion

Based on the foregoing, Mr. Sheneman has not shown that he was denied effective representation, that the evidence was insufficient to support his convictions, or that the interest of justice requires the Court to grant his Rule 33 motion. Accordingly, the Defendant's Amended Motion for a New Trial [DE 138] is DENIED, and the Clerk is DIRECTED to TERM

the original Motion for a New Trial [DE 63], for the reasons stated herein. Given that no hearing was necessary to rule on this matter, the government's request to enter an order waiving the attorney/client privilege is also DENIED [DE 141].

SO ORDERED.

ENTERED:   May 18, 2012  

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court